## CHARLIE LEE LEONARD v. PACIFIC MUTUAL LIFE INSURANCE COMPANY OF CALIFORNIA

(Filed 26 February, 1936.)

**Insurance R c—Evidence held sufficient to be submitted to jury on issue of insured's total and permanent disability.**

> Plaintiff brought this action on a disability clause in a policy of life insurance. Plaintiff's testimony was to the effect that he was a farmer, that for over ninety days prior to filing claim for disability he had been unable to work in his occupation, that he had become extremely nervous, was internally sore, that he had repeatedly attempted to work on the farm but was able to work only for very short periods of time, and plaintiff introduced testimony of witnesses that from their observation of plaintiff, he was unable to do the work of a farmer with reasonable continuity, together with testimony of a medical expert that plaintiff was suffering from nervous disorder which caused him to become fatigued very easily. Defendant insurer introduced testimony of a medical expert that from his examination of plaintiff, plaintiff could perform part of the work of a farmer but not all. Other portions of the testimony of the witnesses did not support plaintiff's contention of total disability. *Held:* All the evidence, considered in the light most favorable to plaintiff, was sufficient to be submitted to the jury on the question of whether plaintiff was totally and permanently disabled within the meaning of the policy.

APPEAL by the plaintiff from *Cranmer, J.,* at October Term, 1935, of NASH. Reversed.

It is admitted by the pleadings that on 23 October, 1924, the defendant issued to the plaintiff a life insurance policy in the amount of $2,000, which contained a permanent total disability provision to the effect that if the insured became totally and permanently disabled before reaching the age of 60 years that the company would waive the payment of all future premiums and pay to the insured a monthly income of $30.00, such waiver to be effective and the first such monthly payment to become due and the period of liability to commence as of the date of receipt at the home office of the company of due written proof of such disability. The policy also contained the following: "Permanent Total Disability as used herein, is defined to mean: (1) . . . (2) Disability caused by accidental bodily injury or disease which totally prevents the insured from performing any work or engaging in any occupation or profession for wages, compensation, or profit, and which shall have totally and continuously so prevented the insured for not less than ninety days immediately preceding the date of receipt of due written proof thereof; or (3) . . ." It is also admitted that the defendant received notice of a total and permanent disability claim from the plaintiff more than 90 days later, 18 January, 1934, the date such disability is claimed and alleged to have commenced.

The plaintiff introduced his evidence and at the conclusion thereof the defendant moved to dismiss the action and for judgment as of nonsuit, which motion was allowed, and from judgment entered accordingly, the plaintiff appealed, assigning errors.

*I. T. Valentine for plaintiff, appellant.*
*J. M. Broughton and W. H. Yarborough for defendant, appellee.*

SCHENCK, J.   The sole question presented by this appeal is whether the plaintiff's evidence was sufficient to be submitted to the jury upon the question of his permanent total disability as defined in the policy.

The plaintiff testified as follows: "I have worked on the farm all my life. I have never done anything else but farm, never done anything but that. I have done anything that come to hand on the farm, grubbed plant beds, worked in new grounds, made corn, tobacco, cotton, and peas. I plowed, primed tobacco, cured tobacco, raised tobacco, and pulled fodder. Along about the first of the year 1934 I was feeling nervous and troubled a little with internal soreness, or maybe two years prior to that, I was slightly bothered about working, and I had to take some little treatment from Dr. Martin once and from Dr. Coppedge. The first of January, 1934, I became so sore and nervous I could not do anything. I had to quit work, my genital organs were sore, swollen, and inflamed. I was swollen and sore in my back, hip, feet, and hands. My fingers were stiff in the morning and I was nervous. My heart troubled me only on exertion, getting around pretty brisk made my heart work faster and made me much more nervous. I was disabled because of soreness in my genital organs and through my body and hip joints and feet and stiffness in my fingers and it knocked me out completely. I have been continuously unable to work on the farm since 18 January, 1934, and I am still in that condition. I was directed by the defendant, the insurance company who issued the policy, to go to Dr. Paul Whitaker, in Kinston, for an examination. I was directed to go to Dr. Paul Whitaker for examination after I filed my claim for disability. Dr. Paul Whitaker examined me at that time and at the request of the defendant I have again offered myself today for examination by Dr. Paul Whitaker, and he examined me again today. Owing to the internal soreness and impairment to my digestion, about 18 January, 1934, I got so I could not eat, I had to live on a very restricted diet, such as milk and a few eggs and things like that, and I couldn't sleep any at nights. Sometimes I would go all night and not sleep any at all, sometimes sleep half a night. In the early spring of last year I tried to do some light work, such as feeding a fertilizer sower, and I found I couldn't. When I attempted to I became sore and nervous and

had to give it up. The first of June I was feeling some better, taking treatment all the time, and I felt improved up some and I decided to try to chop cotton. I chopped cotton about a day and a half, not very hard. I would stop and rest awhile at the end of a row, and this same genital trouble became worse, and it made me very nervous and made my heart run faster. When I would be out trying to chop I would get tired and get to the end of the row and rest some, and then chop another row. I have found since then most any time in riding about any distance I couldn't do any riding much and driving makes this whole side sore (indicating his right side), makes my hip joint extremely sore. If I drive from my residence to Nashville or Rocky Mount and back home I am laid up for two or three days and I can't sleep but very little. I drove to Mr. Wood's store and Mr. Walker's store, two miles, this year, and I haven't been to town as much as once a month. Some of my neighbors have seen me trying to work and I have discussed with them my condition and I have told some of my neighbors I couldn't work. I have been to two doctors this year. Since having to stay very quiet and keep from being sore and suffering I have got to be very forgetful. It seems like my power of concentration is not as good as before. I don't own any farm land. My brother Clyde and I have lived with our mother on her farm. I had charge of my mother's farm from 1920 until January of last year. My brother Clyde has had charge of it since then. I cannot continue to perform with reasonable continuity any work on the farm."

C. Clyde Leonard, brother of the plaintiff, testified, among other things, that his brother, prior to January, 1934, was able and did do manual labor, such as mauling, plowing, chopping, working tobacco, and anything that came to hand on the farm, but that "since 18 January, 1934, has not been able to carry on with reasonable continuity the usual work of a farmer. Since January, 1934, he has tried chopping a little in June and the latter part of May, and he had to quit. It made him sore. I saw in his face expressions of pain. He told me how he suffered. He could not rest at night if he did any work hardly, and it made him sore to work. I have looked after the farm since January, 1934."

Dr. C. T. Smith, a medical expert, testified that he had examined the plaintiff and that "my diagnosis was that he had neurasthenia, condition of the nerves in which he gets fatigued very easily, and does not have the stamina to carry on," and that "in my opinion Mr. Leonard is not able to carry on with reasonable continuity the essential duties of a farmer."

R. L. King testified that he was a neighbor of the plaintiff and had known him for 20 years and saw him often, and that "from my observation of Mr. Charlie Lee Leonard I don't think he could carry on with reasonable continuity the reasonably essential work of a farmer on the farm he was living on in January, 1934."

A. W. Jenkins testified that he had known the plaintiff all his life, and that up to 1 January, 1934, he had done practically all kinds of work on the farm, and further, that "I have an opinion satisfactory to myself from my observation and knowledge of Mr. Leonard as to whether he is, or has been since January, 1934, able to carry on with reasonable continuity the essential elements necessary for farming operations, and in my opinion he cannot, with any accuracy. There might be times when he could, but I do not think he could be depended on."

Dr. Paul Whitaker, of Kinston, testified that he had examined the plaintiff at the behest of the defendant, first on 12 September, 1934, and again on the day of the trial, and in response to the following question made the following answer: "Question. I will ask you this question, if in your opinion the plaintiff, when you examined him on 12 September, 1934, and now, I ask you if he could, in your opinion, follow, do with reasonable continuity, substantially all of the material acts necessary to the prosecution of the business of a farmer in the usual and customary manner of a farmer? Answer. I think he could do part of them, and part of them he could not."

While there are other portions of the testimony of these witnesses that do not tend to support the contentions of the plaintiff, all of the evidence, when construed in the light most favorable to the plaintiff, we think was sufficient to be submitted to the jury, and therefore hold that the trial judge erred in sustaining the motion for judgment as of nonsuit.

This case is governed by *Bulluck v. Insurance Co.,* 200 N. C., 642, where it is emphasized that the policy of the law of this State, in cases of this kind, is to submit conflicting evidence to the jury upon the theory that in the last analysis the jury is the weigh-master of the evidence. Also, in the same case, in construing a disability provision similar to the one in the instant case, it is said: "The reasoning of the opinions seems to indicate that engaging in a gainful occupation is the ability of the insured to work with reasonable continuity in his usual occupation, or in such an occupation as he is qualified physically and mentally, under all the circumstances, to perform substantially the reasonable and essential duties incident thereto. Hence, the ability to do odd jobs of comparatively trifling nature does not preclude recovery. Furthermore, our decisions and the decisions of courts generally, have established the

principle that the jury, under proper instructions from the trial judge, must determine whether the insured has suffered such total disability as to render it 'impossible to follow a gainful occupation.'" See, also, *Fields v. Insurance Co.,* 195 N. C., 262; *Baker v. Insurance Co.,* 206 N. C., 106.

Reversed.